David B.T. MYRICK, Jr., Appellant,

v.

MOODY NATIONAL BANK,
Trustee, Appellee.

No. 01–09–00510–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 10, 2011.

L. Brent Farney, San Antonio, TX, for Appellant.

Angela Olalde, Roni Mihaly, Greer, Herz & Adams, L.L.P., League City, TX, Charles O. Grigson, Austin, TX, Dennis R. Bettison, Bettison, Boyle, Apffel & Guarino, P.C., John A. Buckley Jr., Greer, Herz & Adams, LLP, Galveston, TX, Joseph S. Horrigan, Horrigan & Goehrs, LLP, Houston, TX, Van Henry Archer III, San Antonio, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION

MICHAEL MASSENGALE, Justice.

Appellant David B.T. Myrick, Jr. appeals from a declaratory judgment granted in favor of appellee Moody National Bank. The bank is the trustee and Myrick is a beneficiary of a trust created in 1934. Myrick sued the trustee, seeking a declaratory judgment that it did not have the authority to enter into a lease with terms extending beyond the termination date of the trust. The trustee countersued, seeking, among other things, a declaration of its right to enter into the proposed lease and its authority to borrow against the trust estate. Both parties moved for summary judgment, and the trial court granted partial summary judgment in favor of the trustee, declaring that it had authority to enter into a lease extending 180 days beyond the expiration of the trust and to borrow funds and encumber the trust property. The remaining issues were tried before the court, and the summary-judgment rulings merged into the final judgment.

On appeal Myrick argues that the trustee did not establish its authority to enter into the proposed lease and the trial court lacked jurisdiction to declare the trustee's authority to borrow because the controversy was not ripe. In the event we grant relief to Myrick on either issue, both parties request a remand on the subject of attorney's fees. Finding no error, we affirm.

### Background

During the 1930s, William L. Moody, III (Moody III) and his family owned and

lived on the Rio Bonito Ranch, which consists of approximately 15,000 acres near Junction, Texas. Moody III encountered financial difficulties in 1934, and a creditor foreclosed on the property. Through an agent, W.L. Moody, Jr. (Moody Jr.), the father of Moody III, purchased the ranch at the foreclosure sale and conveyed it to Rio Bonito Ranch, Inc., a corporation created and owned by Moody Jr.

*The trust agreement.* On December 31, 1934, Moody Jr. executed a trust agreement creating an irrevocable trust. Pursuant to the agreement, he conveyed all capital stock of Rio Bonito Ranch, Inc. in trust to City National Bank of Galveston, Texas. City National Bank of Galveston is the former corporate name of the current trustee, Moody National Bank of Galveston. The trust agreement gives the trustee the power to "possess, hold and vote" the Rio Bonito Ranch stock and to "receive, collect and recover all dividends, income and profits therefrom, as if [it] were the absolute owner." The trustee is expressly prohibited from selling "said stock or any part thereof, except as hereinafter provided for" in the trust agreement. The agreement also provides that the trustee may "liquidate said corporation and accept the corporate assets in lieu of the stock, in which latter event such assets shall be possessed, held and managed in lieu of the stock for the accomplishment of the uses and purposes herein set forth and subject to the terms, conditions and powers herein specified."

The settlor specified that the beneficial interest was to be vested in his offspring, including his son, Moody III; his grandchildren, Edna Haden Moody, Virginia Moody, and William Lewis Moody, IV (Moody IV); and his great grandchildren. The trust agreement requires the trustee to pay the taxes, expenses, and fees chargeable to the estate out of the income of the trust, and then to pay the net income from the trust estate to Moody III on a semi-annual basis until his death. After Moody III's death, payments are to be made in equal shares to his children, or if his children are deceased or die before the termination of the trust, to their descendants per stirpes. The agreement specifies several events that would cause the trust to terminate, but the likely terminating event, and the only one that is relevant for purposes of this appeal, is the death of Moody IV, the last survivor of Moody III's children who were living at the time the trust was created. Upon termination, the trustee must distribute the trust estate in equal shares per stirpes to the then-living grandchildren of Moody III and the surviving descendants of his deceased grandchildren.

The trust gives the trustee broad authority and discretion to make decisions concerning the construction and administration of the trust. Paragraph IX provides:

> If any question should arise concerning the construction and administration of this Trust, the Trustee, acting either on its own judgment or under direction or advice, upon such evidence as it shall think fit, may determine such question, and such determination or determinations shall be final and binding on all persons. It is agreed that the Trustee shall have power to determine all matters as to which any doubt, difficulty or question may arise under or in relation to the execution of the Trust.

Following the execution of the trust agreement, Moody III lived on the ranch for a number of years. He died in 1992, survived by all three of his children. His two daughters are now deceased. Moody IV, who was 84 years old at the time of trial, is the last surviving child of Moody III. Unless some other terminating event

occurs, the trust will terminate upon his death, and the trustee will then be required to distribute the trust estate in accordance with the terms of the trust agreement.

*Administration of the trust.* Although Moody III lived on the ranch for many years, it was leased in 1966 to a third party. In 1977, in accordance with the terms of the trust instrument, the trustee dissolved the corporation. Since then, the trustee has held title to the ranch in trust for the beneficiaries. The Rio Bonito Ranch is the sole income producing asset in the trust. The ranch was leased again in 1982 to Rieck Ranch Corporation. As a part of its operations on the ranch, Rieck allowed hunters to pay to hunt wild game on the property. The Rieck lease expired in 1997. At that time, the trustee requested and received bids from prospective lessees.

The trustee entered into a new lease with the highest bidder, ABG, Inc. ABG operates a recreational and hunting enterprise, which utilizes the acreage, ranch house, and other buildings on the ranch. Under the terms of that lease, ABG is responsible for ranch operation costs and some maintenance costs, including road and fence repairs. As a part of its operations, ABG imported non-native game animals onto the ranch and constructed two high-fenced enclosures, which it uses to acclimate the imported animals. ABG enters into agreements with hunters, who pay up to several thousand dollars to hunt on the premises. These hunts are booked weeks or months in advance. The ABG lease and lease extensions terminated in May 2005, but with consent of the trustee, ABG has remained on the ranch as a holdover tenant and has continued to conduct its operations.

The terms of the ABG lease provide that upon termination of the trust, ABG has 30 days to cease operations and remove its personal property from the ranch. As a holdover tenant, ABG continues to be responsible for operations costs, and it is bound to cease operations on the ranch within the same 30–day window.

In 2005 and 2007, the trustee secured appraisals of the fair market value of the ranch. Based on the appraiser's assessments, the trustee determined that the best use of the property and best source of income was to continue leasing the property to ABG. The trustee desired to ensure that the trust would continue to have a source of income by leasing to ABG, and it wished to modify the lease terms to charge an adjustable rental rate to reflect increasing land values. During negotiations over a new lease, ABG expressed concerns regarding its potential economic losses and liability upon termination of the trust. In particular, ABG was concerned about minimizing its personal property losses and avoiding potential liability for canceling hunts after the trust terminates.

To address ABG's concerns related to the unpredictable timing of the termination of the trust, the trustee proposed to allow ABG to remain on the property for 90 days in order to conclude its operations and up to an additional 90 days to remove its personal property, specifically the non-native game animals. Based on its need to secure an income for the trust and the nature of ABG's business, the trustee concluded the proposed terms are reasonable. The trustee also concluded that it had authority pursuant to the terms of the trust and the Texas Trust Code to execute a lease including terms that would extend beyond the duration of the trust. *See* TEX. PROP.CODE ANN. § 113.011(b) (West 2007) ("A trustee may execute a lease containing terms or options that extend beyond the duration of the trust").

*The controversy and procedural back-ground.* After negotiating the terms of the new lease, the trustee informed the trust beneficiaries of its intention to enter into a second lease with ABG. Myrick, a grandson of Moody III and trust beneficiary, objected to the proposed lease terms and challenged the trustee's authority to enter into a lease extending beyond the termination of the trust. He threatened to take legal action against any buyer, lender, or potential tenant involved in a transaction to encumber any part of the ranch property. Myrick also filed a petition seeking declaratory judgment that the trustee lacked authority to enter into the proposed lease. In addition to declaratory relief, he requested that the trial court direct the trustee to distribute the assets of the trust upon the death of Moody IV and to prohibit the trustee from entering into any lease or agreement with a third party that gives the lessee rights in the trust property beyond the date of termination.

The trustee countersued for a declaratory judgment confirming its right to enter into the lease. Specifically, the trustee asked that the trial court to declare that it had authority to lease the trust estate for up to 180 days beyond the duration of the trust and that upon termination of the trust the beneficiaries would take their interest subject to the existing lease. The trustee sought additional relief, including declarations (1) that it may borrow funds and encumber the trust estate to cover operating costs and expenses in the event that the property is no longer occupied by a tenant or the tenant income is inadequate to pay the trust's expenses, and (2) that it has the authority to sell all or part of the trust estate and divide the proceeds among the beneficiaries without causing the trust to terminate. The trustee also sought judicial modification of the trust and attorney's fees.

In support of its counterclaim for declaratory relief, the trustee submitted the affidavit of its chief trust officer, who averred that a declaration of the trustee's ability to mortgage the trust estate was essential to achieve "prudent and efficient administration of [the] Trust." He explained: "Without a tenant in place, the Trust does not have income adequate to pay the taxes and insurance on an on-going basis.... [T]he Trust will need to be able to borrow against the Ranch and pledge it as collateral to repay any expenses in excess of disposable income." Although the current tenant income is sufficient to sustain the trust, the officer averred that the beneficiaries had not received a distribution in several years and that "even with the execution of a new lease, there will be little or no residual funds for distribution in the near future."

The parties filed cross-motions for partial summary judgment. The trial court denied Myrick's motion and partially granted the trustee's requests for declaratory relief, concluding as follows:

> The Trustee has the authority to enter into a lease regarding the Rio Bonito Ranch ... that will permit a lessee to pay stated rentals, remain on and use the property for its business purposes without over harvesting of native species ... for 90 days after termination of the Trust....

> The trustee has the authority to enter into a lease regarding the Ranch that will permit a lessee to feed, secure and remove specified non native game animals from the Ranch for 180 days after termination of the Trust.

> The beneficiaries who are entitled to an interest in the Trust Property on termination of the Trust will take their interest subject to the Lease made the sub-

ject of this proceeding and entered into by the Trustee.

The Trustee has the authority to borrow funds and encumber the Ranch to cover operating or expense items on the Ranch in the event the Trust loses its tenant or the tenant income is inadequate to pay expense and fund reserves.

The trial court denied the trustee's request for a declaration that it had the authority to sell the ranch without terminating the trust.

The remaining issues—the trustee's request for judicial modification of the trust and the parties' requests for attorney's fees—were considered by the court in a bench trial. The trial court determined that the trustee was not entitled to a judicial modification and ordered the parties to bear their own attorney's fees and costs. The trial court entered a final judgment, which incorporated the court's summary-judgment rulings, and Myrick appealed.

On appeal, Myrick raises three issues. He argues (1) that the trial court erred in granting declaratory judgment in favor of the trustee on the issue of its authority to enter into a lease that includes terms extending beyond the termination of the trust, and (2) that the trial court did not have jurisdiction to enter a declaratory judgment on the issue of the trustee's authority to borrow funds because of a purported lack of a ripe controversy. With respect to both issues, Myrick asks that we reverse and render judgment in his favor. In his third issue, he contends that if this court reverses any aspect of the trial court's judgment, we should remand for a new determination of attorney's fees. The trustee argues that this court should affirm the judgment of the trial court, but if this court reverses any part of the judgment, it agrees that we should remand on the issue of attorney's fees.

## Analysis

We review a trial court's summary-judgment decision de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex. 2005). To prevail on summary judgment, the movant has the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *see* TEX.R. CIV. P. 166a(c). In deciding whether there is a disputed issue of material fact precluding summary judgment, we take as true evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in its favor. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex.2005). When, as here, both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary-judgment proof presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Valence,* 164 S.W.3d at 661; *CenterPoint Energy Houston Elec., L.L.P. v. Old TJC Co.,* 177 S.W.3d 425, 430 (Tex. App.-Houston [1st Dist.] 2005, pet. denied).

### I. Trustee's authority to lease

Myrick argues that the trial court erred in granting declaratory relief to the trustee because the trust agreement does not give the trustee the power to enter into a lease extending 180 days beyond the termination date of the trust. He further contends that section 113.011 of the Trust Code—which authorizes a trustee to enter into a lease containing terms that extend beyond the duration of the trust—is inapplicable because it conflicts with the language of the trust agreement. The trus-

tee contends that it may enter into the lease because the four corners of the trust permit it and because there is no conflict between the language of the trust agreement and the Trust Code. Accordingly, to resolve this dispute and determine whether the trustee may enter into the negotiated lease, we must determine whether there is a conflict between the trust agreement and the Code.

The Trust Code applies to all trusts created on or after January 1, 1984 and to all transactions related to trusts created before or after that date. *See* TEX. PROP. CODE ANN. § 111.006 (West 2007). A trustee may exercise any power necessary to carry out the purpose of the trust, except to the extent that the terms of the trust conflict with a provision of the Code or expressly limit the trustee's power. *Id.* §§ 113.001–.002 (West 2007).

Under the Trust Code, the trustee is given broad powers to manage real property. *See id.* §§ 113.009–.012 (West 2007). In particular, "[a] trustee may grant or take a lease of real or personal property for any term," and that "[a] trustee may execute a lease containing terms or options that extend beyond the duration of the trust." *See id.* § 113.011. If the Trust Code applies in this case, then the trustee generally has the power to enter into a lease extending beyond the duration of the trust, and more specifically, the trustee has the authority to enter into the proposed lease with ABG.

■ However, "[a] power given to a trustee by [the Trust Code] does not apply to a trust to the extent that the instrument creating the trust, a subsequent court order, or another provision of [the Code] conflicts with or limits the power." *Id.* § 113.001. Accordingly, if the trust instrument expressly limits the powers of the trustee or if it provides that the trustee has greater powers than those conferred

by the Trust Code, then the language of the trust instrument will control. But if the terms of the trust instrument do not limit or conflict with a power given to trustee, the default rules supplied by the Trust Code apply. *See id.; Dierschke v. Cent. Nat'l Branch of First Nat'l Bank at Lubbock,* 876 S.W.2d 377, 380 (Tex.App.-Austin 1994, no writ).

■ Because powers granted under the Trust Code are inapplicable to the extent they conflict with the instrument creating the trust, we must examine the trust created by Moody Jr. to determine whether it precludes the trustee from entering into a lease of the trust property beyond the expiration of the trust. The trust agreement provides that the trustee has authority to possess, hold, and manage the trust assets. It states:

> The trustee shall possess, hold and vote said shares of stock; receive, collect and recover all dividends, income and profits therefrom, as if the Trustee were the absolute owner; provided, however, that said Trustee shall not have the power to sell [the] stock....

It also permits the trustee to liquidate the assets of the corporation, "in which ... event such assets shall be possessed, held and managed in lieu of the stock for the accomplishment of the uses and purposes herein set forth and subject to the terms, conditions and powers herein specified."

The trust agreement describes to whom and how frequently distributions should be made to the beneficiaries, and it describes the trustee's duties upon the termination of the trust:

> After the payment of the Trustee's fees, taxes and expenses properly chargeable to the Trust Estate ... the Trustee shall pay over the net income from the Trust Estate semi-annually ... in equal shares to [the beneficiaries].

....

[The] Trust shall terminate when the last survivor of William Lewis Moody, III's children ... shall have died.... Unless the Trust Estate has been disposed of as herein provided before the death of the last survivor of William Lewis Moody, III's children, then the Trustee shall, upon the termination of the Trust, distribute the Trust Estate in equal shares per stirpes to the then living grandchildren of William Lewis Moody, III, and the surviving issue of his deceased grandchildren.

The trust agreement does not place any other express limitations on the trustee's power to manage the assets and administer the trust, though Myrick contends that the trustee's power is also limited to "the accomplishment of the uses and purposes" of the trust and by "the terms, conditions and powers ... specified" by the trust instrument. We also note in this regard that the trust agreement provides that the trustee, as manager of the trust, has the discretion "to determine all matters as to which any doubt, difficulty or question may arise under or in relation to the execution of the trust," and to resolve concerns regarding the administration of the trust "on its own judgment" and "upon such evidence as it shall think fit."

To prevail, Myrick must demonstrate that the terms of the trust agreement conflict with the Trust Code. Significantly, neither party contests the trustee's general authority to lease the ranch, and the terms of the trust agreement do not expressly limit the trustee's authority to enter into or to negotiate the terms of a lease. Myrick argues, however, that the provision in the trust agreement requiring the trustee to distribute the trust estate "upon the termination of the trust" conflicts with section 113.011's authorization of lease terms extending beyond termination of the trust.

■ We interpret trust instruments the same way as wills, contracts, and other legal documents. *Lesikar v. Moon*, 237 S.W.3d 361, 366 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). In interpreting a trust instrument to determine the powers of the trustee, we look to the four corners of the trust instrument to ascertain the settlor's intent. *Hurley v. Moody Nat'l Bank of Galveston*, 98 S.W.3d 307, 310–11 (Tex.App.-Houston [1st Dist.] 2003, no pet.). If possible, the court should construe the instrument to give effect to all its provisions so that no provision is rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). To the extent the trust instrument is silent, the provisions of the Trust Code govern. *See* TEX. PROP. CODE ANN. § 113.001; *Conte v. Conte*, 56 S.W.3d 830, 832 (Tex.App.-Houston [1st Dist.] 2001, no pet.).

While this trust is still in existence, the trustee has the authority to "possess, hold, and manage" the trust assets. The trustee must manage the property "as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust," and must "exercise reasonable care, skill, and caution" in doing so. TEX. PROP.CODE ANN. § 117.004 (West 2007). The trust instrument provides that the trustee, acting on its own judgment, may determine questions related to the construction and administration of the trust and that such determinations are final and binding upon all persons. When the trust terminates, the trustee must, within a reasonable time and in accordance with the trust instrument, distribute the estate "in equal shares per stirpes to the living grandchildren of [Moody III] and the surviving issue of his deceased grandchildren." *See*

*id.* § 112.052 (discussing termination of trusts).

Myrick contends that the trust instrument unambiguously requires the trustee to distribute the trust estate immediately upon the termination of the trust. He argues that the terms of the trust require the trustee to distribute the ranch to the beneficiaries and that the beneficiaries must receive a possessory interest in the land. He contends that section 113.011 contradicts the terms of the trust instrument because if the trustee is allowed to enter into a lease with terms that extend beyond the termination of the trust, it will not be able to fulfill its mandatory duty to distribute the trust estate and the beneficiaries will be deprived of the use and enjoyment of the ranch.

While the trustee is obligated to distribute the estate when the trust terminates, it does not follow that the beneficiaries must be able to immediately occupy the land to the exclusion of any leaseholder. Nothing in the trust agreement expressly states that the trustee cannot enter into a lease containing terms that extend beyond the termination of the trust, nor does it require the trustee to distribute the trust assets free of encumbrances. Moreover, nothing in the trust agreement indicates that the settlor intended the beneficiaries to receive an immediate possessory interest in the ranch property. Indeed, had the trustee elected to continue to hold the assets in stock, as the trust agreement expressly contemplates, the beneficiaries would have received shares of stock in Rio Bonito Ranch, Inc. (instead of an undivided direct interest in land) and the right to receive a proportionate share of rentals paid by ABG during the 180 days it is permitted to remain on the Ranch property after the trust terminates. Had the corporation not been dissolved, the beneficiaries would have received the right to vote on how to operate the corporation, but they would not have been entitled to an immediate possessory interest in the Rio Bonito Ranch. Now, assuming the trustee enters into the proposed lease with ABG, the beneficiaries will simply take their interest subject to the tenant's right to remain on the property for up to 180 days. The trustee will not be thereby prevented from exercising his duty to distribute the trust property in accordance with the terms of the trust instrument. *See* TEX. PROP.CODE ANN. § 112.052; *Sorrel v. Sorrel*, 1 S.W.3d 867, 870–71 (Tex.App.-Corpus Christi 1999, no pet.).

Because we conclude that the trust provision requiring distribution of the trust estate upon the termination of the trust is not in conflict with section 113.011 of the Trust Code, we hold that the trustee has the power to enter into a lease with ABG containing commercially reasonable terms that extend the lease beyond the termination of the trust, and we overrule Myrick's first issue.

## II. Trustee's authority to borrow

In his second issue, Myrick argues that the trial court erred in granting the trustee's request for declaratory relief concerning its authority to borrow funds and encumber the trust estate because the issue was not ripe for adjudication.

The purpose of the Declaratory Judgments Act is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations...." TEX. CIV. PRAC. & REM.CODE ANN § 37.002 (West 2008); *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). "Whether a court has subject-matter jurisdiction to consider an action for declaratory judgment depends upon whether the underlying controversy falls within the constitutional and statutory jurisdiction of the court." *Fort Bend Cnty.*

*v. Martin–Simon,* 177 S.W.3d 479, 483 (Tex.App.-Houston [1st Dist.] 2005, no pet.). Section 37.005 of the Civil Practice and Remedies Code and section 115.001 of the Trust Code further provide that district courts have jurisdiction in all proceedings concerning trusts, including proceedings brought by a trustee to determine its powers, responsibilities, and duties under the trust. TEX. CIV. PRAC. & REM.CODE ANN. § 37.004 (West 2008); TEX. PROP.CODE ANN. § 115.001 (West 2007). There is a justiciable controversy between parties if there is a real and substantial controversy involving a genuine conflict of tangible interests and not merely a theoretical dispute. *Bonham State Bank,* 907 S.W.2d 465, 467 (Tex.1995); *Di Portanova v. Monroe,* 229 S.W.3d 324, 329 (Tex.App.-Houston [1st Dist.] 2006, pet. denied).

Here, the trustee sought, and the trial court granted, a declaration that "[t]he Trustee has the authority to borrow funds and encumber the Ranch to cover operating or expense items on the Ranch in the event the Trust loses its tenant or the tenant income is inadequate to pay expense and fund reserves." Because of the precarious financial situation of the trust estate, the trustee believed it likely that the trust would need to borrow funds or encumber the trust estate in order to pay trust expenses. In a sworn affidavit, the chief trust officer explained that "[w]ithout a tenant in place, the [t]rust does not have income adequate to pay the taxes and insurance on an on-going basis.... In the event the lease income ceases, the Trust will need to be able to borrow against the Ranch and pledge it as collateral to repay any expenses in excess of disposable income." The officer's affidavit states that Myrick informed the trustee that he opposed its authority to encumber or pledge any party of the ranch as collateral and threatened legal action against any lender involved in such a transaction. The officer

further explained that the marketability of the property has been adversely impacted by the threat of litigation because it is obligated to convey Myrick's threats to prospective tenants, lenders, and purchasers.

Myrick argues for the first time on appeal that this issue is not ripe and that the trial court's declaration regarding the trustee's power to borrow funds is an impermissible advisory opinion on a hypothetical situation. However, a threat of litigation in the immediate future can provide the basis for a ripe controversy. *See, e.g., Harris Cnty. Mun. Utility Dist. No. 156 v. United Somerset Corp.,* 274 S.W.3d 133, 140 (Tex.App.-Houston [1st Dist.] 2008, no pet.). Although there is currently a tenant leasing the trust estate, its status is that of a month-to-month holdover tenant. The trustee alleged that the trust estate is not well funded, and there is no dispute that despite receiving annual lease revenues of approximately $145,000, the trustee has not made a distribution to the beneficiaries in several years. Even if the proposed lease with the current tenant is executed, the trustee does not anticipate that that there will be a distribution for several more years. Myrick has indicated that he would oppose the trustee and take action against any party involved if the trustee seeks to borrow money against the trust estate. The trustee's ability to make prudent management decisions is and has been affected by its inability to provide reasonable assurances to prospective tenants and lenders regarding the liability they may face upon entering into an agreement with the trust. And, given Myrick's history of initiating litigation with respect to this and other related trusts, as well as the disagreement among the beneficiaries, litigation seems unavoidable. Accordingly, we hold that a ripe controversy exists and the trial court had jurisdiction to grant the

trustee's request for declaratory relief. We overrule Myrick's second issue.

### III.  Attorney's fees

In his final issue, Myrick asks this court to remand on the issue of attorney's fees if we reverse any part of the trial court's judgment.  Because we hold that the trial court did not err in its judgment declaring the trustee's right to enter into a lease with terms that extend 180 days beyond the termination date of the trust, and because the trial court had jurisdiction to enter judgment on the issue of the trustee's right to borrow against the trust estate, we do not reach this issue.

### Conclusion

We affirm the judgment of the trial court.